TRYGVE LINCOLN GAALAAS, AN INFANT BY HIS PARENTS
AND NEXT FRIENDS, PEDER GAALAAS AND TONI GAALAAS

v.

GRACE PATRICIA MORRISON, EXECUTRIX OF THE ESTATE
OF SAMUEL S. MORRISON, II, DECEASED

Record No. 831941

March 6, 1987

Present: All the Justices

*Bernard S. Cohen (Peter A. Cerick; Andrew E. Greenwald*, on briefs), for appellant.

*Tara M. McCarthy (Norman F. Slenker; Slenker, Brandt, Jennings & Johnston*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This is a medical malpractice suit against the estate of a pediatrician, Samuel S. Morrison, II, M.D. (Dr. Morrison).[1] The plaintiff, Trygve Lincoln Gaalaas, was born on July 4, 1970. Dr. Morrison saw the baby for the first time two hours after the baby's birth. Plaintiff contends that Dr. Morrison was negligent in several respects and that as a result plaintiff suffered brain damage which led, in turn, to several other injuries.

The case was tried to a jury. Dr. Morrison defended on the ground that the infant's injuries resulted from events which occurred prior to his assuming duties as the infant's pediatrician.

---

[1] Dr. Morrison died November 17, 1979, a little less than one year prior to the filing of this suit on November 13, 1980. Grace Patricia Morrison, the executrix of Dr. Morrison's estate, was substituted as defendant by order dated February 20, 1981.

The jury returned its verdict in favor of Dr. Morrison. The trial court entered judgment on that verdict.

On appeal, the infant contends that the trial court erred in the following six ways:

1. in writing and granting Jury Instruction "X";
2. in refusing to clarify Jury Instruction "X";
3. in admitting into evidence the low Apgar rating of 2 appearing in the mother's hospital records which was not verified by the recorder as required by *Neeley* v. *Johnson*, 215 Va. 565, 211 S.E.2d 100 (1975);
4. in allowing questions to be posed by defendant's counsel to expert witnesses called by both plaintiff and defendant which assumed the low Apgar Rating of 2 to be accurate;
5. in denying plaintiff's motion for a new trial; and
6. in refusing to consider the foreman's affidavit which was offered at the motion for new trial which confirmed that the jury was confused by Jury Instruction "X."

Because of the manner in which we dispose of this appeal, we will limit our discussion to issues 1, 3, and 4.

The pertinent facts are as follows: The infant was due on August 22, 1970. However, in late June 1970, the expectant mother's membranes began leaking. The mother's physician, Dr. Gordon Nidiffer, advised her to rest and told her to notify him if her temperature exceeded 99 degrees. On July 4, 1970, the mother's temperature reached 100.8 degrees and she was admitted to the hospital.

The infant was born at 8:30 p.m. on July 4. Dr. Nidiffer testified that the delivery was normal, with no complications. He assigned the newborn an Apgar Score[2] of 7 at one minute after birth and of 10 at five minutes after birth. A certified registered nurse anesthetist who was also present at the infant's birth assigned an Apgar Score of 2 at one minute and of 7 at five minutes. Dr. Nidiffer testified further that the infant had breathing

---

[2] The Apgar Score is a system of scoring an infant's physical condition. The score is usually assigned at intervals of one minute and five minutes after birth. *See* Taber's Cylopedic Medical Dictionary A-107 (13th ed. 1977) (hereinafter referred to as "Taber's at ____."); Nelson, Textbook of Pediatrics 334 (10th ed. 1975). The heart rate, respiration, muscle tone, color, and response to stimuli are scored 0, 1, or 2. The maximum score is 10.

problems at birth and required some resuscitation. Approximately seven minutes after birth, the infant was transferred to the nursery and placed in an isolette where he received oxygen.

Dr. Morrison, who first saw the child at about 10:30 p.m. on July 4, was not alive to testify at trial. However, the trial court admitted into evidence a written statement prepared by Dr. Morrison setting forth his recollection of events. He wrote that when he saw the infant on the night of July 4, he observed flaccid paralysis of the upper and lower extremities, general cyanosis,[3] absence of the usual spontaneous movements, absence of the usual cry, and rapid breathing. According to Dr. Morrison, the infant's condition was "quite poor from birth."

On the morning of July 5, the infant was taken off oxygen. At that time, the infant's color was good and he had a strong cry. According to Dr. Morrison's statement, on the morning of July 5, he observed spontaneous leg movement but still found flaccid paralysis in the arms. Dr. Morrison stated further that because of the flaccid paralysis, the baby still was not sucking his fists twelve hours after birth even though the baby should have engaged in that activity immediately after birth. Dr. Morrison's statement went on to say that he ordered a bilirubin[4] test and penicillin on July 5. The result of the July 5 bilirubin test was a reading of 2.8 milligrams %, a result "essentially" within normal limits.

On the morning and afternoon of July 6, the infant was noted to be weak and was placed on penicillin. The infant was also noted to have spells of apnea, that is, temporary suspension of respiration, but he responded to gentle stimulation.

Dr. Morrison visited the infant on the morning of July 7. Prior to that visit, a notation had been placed in the infant's chart describing the infant as listless and jaundiced.[5] In his statement, Dr. Morrison admitted that, on July 7, he found the infant jaundiced. He did not, however, order a bilirubin test on July 7.

---

[3] Cyanosis is the slightly bluish, grayish, slatelike, or dark purple discoloration of the skin due to presence of abnormal amounts of reduced hemoglobin in the blood. Taber's at C-135.

[4] Bilirubin is the orange-colored or yellowish pigment in bile. It is carried to the liver by the blood. Taber's at B-29.

[5] Jaundice is a condition characterized by yellowness of the skin and whiteness of eyes, mucous membranes and body fluids due to deposition of bile pigment resulting from excess bilirubin in the blood. Taber's at J-1.

On July 8, in the early morning hours, the nursery called Dr. Morrison to advise him that the infant did not look too good. Dr. Morrison went to the hospital and saw the infant at about 4:00 a.m. He found the infant to be listless but otherwise unchanged. He did not order a bilirubin test at that time. Between 7 and 8 a.m. on July 8, one of the nurses advised Dr. Morrison that Dr. Nidiffer, who delivered the infant, had ordered a bilirubin test. The second bilirubin test showed a bilirubin level of 30.0 milligrams %. According to an agreed statement, this was a markedly high, abnormal level of bilirubin.

The infant was transferred to Children's Hospital in Washington, D.C., where he underwent three exchange transfusions in an effort to lower his bilirubin level. Over a period of a few days the infant's bilirubin level gradually fell to an acceptable level. While at Children's Hospital, the infant received the drug kanomycin. The hospital records from Children's Hospital and from Loudoun Memorial Hospital, where the child was born, suggested that the probable cause of the jaundice was sepsis[6] or a bacterial infection.

The evidence showed that Gaalaas suffers from a bilateral asymmetrical sensorineural hearing loss which is greater in the right ear; that he must rely on his left ear for understanding speech; that he cannot use his right ear for communication purposes; that up to the present he has excellent understanding of conversational speech but only under relatively quiet listening conditions; that he has listening problems when it is noisy, when he is unable to see those talking to him, when someone talks to him from his right side, when conversation moves quickly, and when he is some distance from those talking to him; that test results have documented shifts towards poorer hearing in the left ear; and that the hearing loss is permanent.

The evidence also showed that Gaalaas has some motor difficulties or difficulties with muscle performance. He was described as clumsy in fine motor coordination. He was said to have difficulty in walking, to have poor balance, and to drag his right toe in walking. He was characterized as having mild spastic cerebral palsy, which especially affected the legs. These conditions were described as permanent. Gaalaas' evidence was that the high level of bilirubin most probably caused the injuries because the biliru-

---

[6] Sepsis is a pathologic state resulting from the presence of microorganisms or their poisonous products in the blood stream. Taber's at S-33.

bin level led to kernicterus or injury to a portion of Gaalaas' brain.

Gaalaas' evidence further established that his cerebral palsy was caused by bilirubin damage and that damage from anoxia was improbable. His evidence also showed that if the bilirubin level had been monitored and prevented from rising, the injuries he suffered could have been prevented.

Gaalaas' evidence showed further that Gaalaas suffered from a spastic weakness of both legs, the right more than the left; a spastic weakness, less marked, of the right hand and arm; a slight but detectable problem with the left hand and arm; a slight weakness of the right face; dystonia, evidenced by the abnormal posturing of his fingers; motor overflow of the facial muscles, a situation in which Gaalaas could not, upon request, keep his facial muscles still; hearing loss in the right ear; and impairment of mental abilities. All the conditions were described as permanent. All were said to have been caused by the high bilirubin level.

Dr. Morrison's evidence sought to establish that the child's problems were caused not by the high bilirubin level but by anoxia. One witness pointed to the Apgar Score of 2 saying that a number that low indicated a baby that was high risk at birth. The witness testified that the child's breathing difficulties and blue coloration suggested that the child's oxygen intake was poor. The witness went on to say that oxygen deprivation could lead to brain damage. The witness described the child's injuries as mild and said they were not consistent with hyperbilirubinemia[7] and kernicterus but were consistent with oxygen deprivation or anoxia. However, this witness was not able to say that the hearing loss was caused by anoxia. He simply said that the cause of that loss was "speculative." He admitted, though, that sensory neural hearing loss is one of the classic signs of kernicterus. The witness said that both the hearing loss and the dystonia were "coincidental."

Another of Dr. Morrison's witnesses said he saw no evidence of bilirubin involvement "except for the hearing problem." He said he was confident that the child's problems were caused by prematurity or the lack of oxygen "with the possible exception — with the likely exception of the hearing problem." This witness also stated that the drug kanomycin that was administered to Gaalaas at Children's Hospital could "cause impairment of hearing."

---

[7] Hyperbilirubinemia is excessive bilirubin in the blood. Taber's at H-70.

At the conclusion of all the evidence, the parties argued jury instructions. Instruction X is at issue in this appeal. It was drafted by the trial court after considering the argument of counsel. It reads as follows:

> The fact of Plaintiff's condition does not, of itself, entitle Plaintiff to recover.
>
> In order for the Plaintiff to recover in this action it must be shown, by a prepreponderance of the evidence, that Dr. Morrison was negligent in the care and treatment of his patient in that:
>
> 1) He did some particular thing or things not in accordance with the standard of care existing in Loudoun County, Virginia in July 1970; or
> 2) He failed to do some particular thing or things that were required under the standard of care existing in Loudoun County, Virginia in 1970.
>
> And if the jury are uncertain as to whether any such negligence has been thus proven by a preponderance of the evidence, or if you believe that it is just as probable that the defendant was not guilty of any such negligence as it is that he was, then you shall return your verdict in favor of the defendant.
>
> You are further instructed that if you believe from the evidence that a particular injury complained of by the Plaintiff may have resulted from either of two causes, for one of which Dr. Morrison was responsible and for the other of which he was not, and if the jury are unable to determine which of the two causes occasioned the injury complained of, the [sic] your verdict must be for the Defendant, Dr. Morrison, as to that particular injury.

Gaalaas' counsel objected to Instruction X on the ground that it was confusing. He made several arguments in support of that proposition. One argument was that from the way the instruction was written the jury might conclude that if even one of Gaalaas' several groups of injuries was not attributable to Dr. Morrison's negligence, the jury would have to find for the defendant. Stated differently, the argument was that the only way Gaalaas could have recovered under Instruction X was by proving that all of his disa-

bling injuries were attributable to Dr. Morrison's negligence. Another argument was that if the jury did not believe that all conditions from which plaintiff suffers were caused by the elevated and unmonitored bilirubin, this should be reflected in the damage award, not in an overall finding for the defendant. Refining this latter argument in oral argument, Gaalaas submits that in Instruction X the trial court confused a damage instruction with a causation instruction. Further, in oral argument, Gaalaas contended Instruction X was confusing and misleading because the jury could conclude that if any of the infant's problems were not the result of a single injury caused by Dr. Morrison then the jury was required to return a verdict for defendant.

At the time instructions were argued, defendant's counsel did not state whether he considered the instruction confusing or not. On brief and in oral argument, counsel for Dr. Morrison contended that the instruction was an accurate statement of the law and that it was appropriate precisely because it ends with the phrase "as to that particular injury." Defense counsel argues that Instruction X permitted the jury to find in favor of the plaintiff on one, some, or all of the injuries complained of.

After the jury received its instructions and retired to deliberate, it sent the following question to the trial court concerning Instruction X:

> The jury needs clarification of instruction X, last paragraph, relating to the phrase "particular injury", in that plaintiff has several injuries claimed. Some which could be caused by bilirubin damage and others by anoxia.

The jury's question was discussed by court and counsel. Defense counsel argued as follows: "Your Honor, it's my position and my firm belief that the final paragraph is clear. Even though they may feel that they don't understand it or are confused by it, I don't think we ought to be giving them any further instruction." Plaintiff's counsel argued that the court should clarify the instruction. He said, "it seems to me that their question is saying does particular injury mean the condition of the child or does it mean the particular injury that the kid has, or does it mean separately each one of the enumerated things claimed." He said further that if the instruction had said "the plaintiff complains of numerous injuries, that would have clarified it." The trial court permitted

plaintiff's counsel to place his proposed response in the record. It read as follows: "The term 'particular injury' relates separately to each injury claimed and is not meant to contain all injuries as a whole."

The trial court decided to give the jury the following response: "You are instructed that your question indicates your understanding of the term 'particular injury' as used in Instruction X. Please consider again that term in light of the language of that instruction." At the time it announced to counsel how it would respond to the jury's inquiry, the trial court said "If they still don't understand, I'll consider the matter further." The jury did not make any further inquiry; it simply returned a verdict for defendant.

Gaalaas' first argument regarding Instruction X is that it should never have been granted. In our view, he is correct. Therefore, we need not consider the other argument concerning the trial court's response to the jury's question, nor the arguments concerning Gaalaas' motion for a new trial.

Gaalaas contends that the instruction was confusing and misleading to the jury. In this regard, he relies upon *Southers* v. *Price*, 211 Va. 469, 473, 178 S.E.2d 685, 688 (1971), where we rejected an instruction which was "confusing, argumentative, and subject to misunderstanding." In *Southers*, we explained that the office of an instruction "is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them." *Id.*, 178 S.E.2d at 688 (quoting *Trucking Company* v. *Flood*, 203 Va. 934, 936, 128 S.E.2d 437, 439 (1962)). Instructions are meant to aid the jury in its deliberations, not to make such deliberations more difficult. This case was a multiple injuries case. Plaintiff asserted such in his motion for judgment. Yet Instruction X nowhere makes clear that it is aimed at a problem of multiple injuries. It does not use the word injury in its plural form. It does not mention "several," "numerous," "many," or "more than one" injury. More importantly, it does not tell the jury that plaintiff can recover if he proves that any one of his several injuries was caused by Dr. Morrison's negligence. At two places in the final paragraph, the instruction refers to "particular injury." Yet at another place it refers simply to "the injury."

■ This was a hotly contested case. The evidence was, for the most part, in sharp conflict on the issue of causation. Such a case is peculiarly suited for resolution by a jury. But, precisely because it was such a well-fought jury case, "the instructions should have

been most carefully drawn." *Virginia Ry. & P. Co.* v. *Burr*, 145 Va. 338, 348, 133 S.E. 776, 779 (1926). For the reasons set forth above, we conclude that Instruction X was confusing and subject to misunderstanding. We hold, therefore, that it was error to grant Instruction X.

The remaining issue that must be addressed concerns the trial court's admitting into evidence hospital records that showed an Apgar Score of 2 given by the nurse anesthetist at the time of the infant's birth. This information is contained in the Anesthesia Record in the mother's hospital chart. Gaalaas complains that the Apgar Score is an opinion and thus under *Neeley* v. *Johnson*, 215 Va. 565, 211 S.E.2d 100 (1975), it should not have been admitted into evidence.

■ We need not decide the fact-versus-opinion issue advanced by Gaalaas in order to resolve the question of the use of the nurse anesthetist's Apgar Score. This is so because at least two of defendant's witnesses relied upon the medical records, including the Apgar Score of 2, in rendering their expert opinion. At the time of trial, Code § 8.01-401.1 was in effect. It provides in pertinent part as follows:

In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. *The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.*

(Emphasis added.) Here, plaintiff does not contend that hospital records are not normally relied upon by medical doctors in giving their expert opinion as to the causes of injuries to patients. The Apgar Score of 2 was clearly relied upon by Dr. Morrison's experts. Thus, Dr. Morrison's counsel had the right to cross-examine plaintiff's witnesses concerning the possible meaning of an Apgar Score of 2. The only significance of the score of 2 was that it was relied upon by defense witnesses to support their contention that the child was injured before Dr. Morrison started his course of treatment. Because of the manner in which the Apgar Score of 2

was utilized in this case, even if such a score is opinion rather than fact, we hold that its admission into evidence in this case along with the rest of the hospital records was harmless error.

In light of all the foregoing, we will reverse the judgment of the trial court and remand this case for a new trial on all issues.

*Reversed and remanded.*

COMPTON, J., dissenting in part.

I disagree with the majority's conclusion that the granting of Instruction X constituted reversible error.

Under established rules, instructions are to be read together and construed as a whole. Principles of law applicable to the evidence which may not be plain in one instruction may be clarified in another. *Van Duyn* v. *Matthews*, 181 Va. 256, 261, 24 S.E.2d 442, 444 (1943). And when instructions in a given case are inspected on appeal, a jury verdict confirmed by the trial court will not be disturbed by the appellate court when it can be seen that the instructions collectively could not have misled the jury. *Adamson* v. *Norfolk & Portsmouth Traction Co.*, 111 Va. 556, 561, 69 S.E. 1055, 1058 (1911).

The plaintiff's theory of the case was that all the child's injuries were due to the physician's negligence and were caused by the elevated bilirubin. The defendant maintained that the doctor was not guilty of any negligence which proximately caused any of the injuries and presented evidence that the child's problems were caused by, among other things, anoxia.

Presented with conflicting evidence as to various injuries and the causes of those injuries, the trial court instructed the jury as follows in Instruction J:

"Damages are not presumed nor may they be based upon speculation, but must be proven; and the burden is upon the plaintiff to prove by a preponderance of the evidence any item or element of damage claimed and that it is properly attributable to the negligence of the defendant; and *unless such item or element of damage is thus proven by a preponderance of the evidence, then the plaintiff cannot recover for such item or element.*" (Emphasis added).

In Instruction X, which the majority says was "subject to misunderstanding," the trial court stated,

"[I]f you believe from the evidence that *a particular injury complained of* by the Plaintiff may have resulted from either of two causes, for one of which Dr. Morrison was responsible and for the other of which he was not, and if the jury are unable to determine which of the two causes *occasioned the injury complained of*, the[n] your verdict must be for the Defendant, Dr. Morrison, *as to that particular injury*." (Emphasis added).

Instruction J was a general burden-of-proof instruction on the issue of damages. That instruction dealt with, first, the burden to prove any particular "item or element of damage claimed" and, second, the burden to prove that the negligence of the defendant caused such item or element. Then, concentrating on a single "item or element" to the exclusion of other items or elements, the court told the jurors there could be no recovery for such "item or element" unless the same had been proven by a preponderance of the evidence.

Instruction X was another burden-of-proof instruction. In clear, plain, and unambiguous terms, the court again focused on proof of a single item or element of damage to the exclusion of others and on the issue of causation. The court directed the jurors' attention for the second time to "a particular injury." The court told the jurors that if they were unable to determine whether a particular injury resulted from either of two causes, for one of which the physician was not responsible, then the plaintiff could not recover for "that particular injury."

In my view, these instructions, when read either separately or together—but especially when construed together—were not misleading and clearly apprised the jury of the pertinent law in conformity with the defendant's theory of the case. The plaintiff's theory on damages was covered fully in yet another damage instruction, Instruction 8. That instruction dealt at length with the plaintiff's "injuries" in the plural. Thus, in three instructions the jurors were informed fully on multiple injuries collectively and on separate injuries individually.

Consequently, I would affirm the judgment of the trial court.

CARRICO, C.J., and RUSSELL, J., join in dissent.