# Michael O. McMunn

## v.

# Charlotte A. Tatum

Record No. 870115

April 21, 1989

Present: All the Justices

W. Kennedy Simpson (Murray H. Wright; Wright, Robinson, McCammon, Osthimer & Tatum, on briefs), for appellant.

Thomas W. Williamson, Jr.; Carolyn C. Lavecchia; Emroch & Williamson, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

Three questions are presented by this appeal from a plaintiff's judgment in an action for dental malpractice: (1) whether the court erred in limiting the dentist's evidence concerning other patients treated on the day of the alleged malpractice; (2) whether it was error to preclude an expert witness from relating, as the basis for his opinion, the hearsay opinions of others; and (3) whether it was error to admit proof of plaintiff's medical bills without foundation evidence that they were a necessary consequence of the defendant's negligence.

## I. EVIDENCE

Charlotte A. Tatum, a registered nurse, consulted Michael O. McMunn, a licensed dentist practicing general dentistry in Henrico County, in September 1984. After several treatments for dental pain, Dr. McMunn recommended extraction of the first molar in Mrs. Tatum's left mandible. Mrs. Tatum gave Dr. McMunn a medical history of collagen vascular disease, continuing therapy on prednisone, a steroid drug having adverse effects upon the body's immune system, and a history of prolonged bleeding after surgical procedures.

Mrs. Tatum, accompanied by her husband, went to Dr. McMunn's office on September 10, 1984, for the extraction. Their testimony was that the procedure lasted from noon until approximately 2:30 p.m., although Dr. McMunn's testimony was that it lasted 30 to 40 minutes. Mrs. Tatum contends that the appropriate standard of care was violated in part because the length of the procedure, which should not have exceeded 45 minutes, subjected her to excessive trauma. She also takes the position that Dr. McMunn was negligent in undertaking the procedure in his office, in view of her medical history. She contends that the appropriate standard of care required referral to an oral surgeon. It is undis-

puted that the tooth broke during extraction, leaving a large part of the root in the socket, and that this root was broken into fragments by the use of burrs and was removed by picks.

Mrs. Tatum experienced pain and recurrent bleeding at the wound site after the operation. She was treated as an outpatient and was admitted to the Medical College of Virginia for further oral surgery. In November 1984, she developed osteomyelitis, an infection of the bone, and was re-admitted to the hospital for removal of a part of her left mandible. When those procedures failed to cure her osteomyelitis, she was referred to a physician at Duke University Medical Center, where she was admitted on three separate occasions for periods aggregating about four months. Her treatment during those periods included antibiotic therapy, two surgical removals of infected bone, removal of two additional teeth, and approximately 80 hyperbaric oxygen treatments. Her medical, pharmaceutical, and hospital bills exceeded $100,000.

Mrs. Tatum brought this action against Dr. McMunn for professional malpractice, alleging that her suffering and expenses were the proximate results of his negligence. After a ten-day trial, the jury returned a $350,000 verdict in her favor upon which the court entered judgment. We awarded Dr. McMunn an appeal.

## II. EVIDENCE CONCERNING OTHER PATIENTS

As noted above, Mrs. Tatum contended that Dr. McMunn was negligent in that the extraction procedure he employed lasted approximately two and one-half hours, a time interval partly corroborated by her husband's testimony. She introduced expert testimony to the effect that the appropriate standard of care required the procedure to be completed in 30-45 minutes. The length of time is significant because a longer time subjects the patient to unwarranted trauma, opening the way to subsequent complications. Dr. McMunn testified that the actual surgical procedure lasted no longer than 40 minutes, although Mrs. Tatum was undoubtedly in his office for a much longer time, awaiting the effects of anesthesia and recovering from anesthesia.

In discovery proceedings before trial, it became apparent to plaintiff's counsel that although the Tatums claimed that Mrs. Tatum had been in Dr. McMunn's office from 12:00 noon to 2:30 p.m., Dr. McMunn would testify that she came earlier and left by 12:07 p.m. Dr. McMunn also said that he had seen 15 other pa-

tients in his office on September 10, 1984. Plaintiff's counsel sought discovery of Dr. McMunn's appointment book for that day, but the defense responded that the book in question was missing, although earlier appointment records were available. Plaintiff's counsel then sought discovery of Dr. McMunn's computerized billing records for the day in question, and requested a description of the services rendered and the time of rendition to each patient named on the day's billing record. After receiving this information, plaintiff's counsel advised Dr. McMunn of his intent to interview two of the patients, Mrs. Porter and Mrs. Hare, who had been in the office between 12:00 noon and 2:30 p.m.

Defense counsel sought a protective order limiting communication between plaintiff's counsel and Mrs. Porter and Mrs. Hare, and preventing contact with all other patients since they were irrelevant to the case. The court entered a protective order limiting plaintiff counsel's contact with Mrs. Porter and Mrs. Hare to written questions relayed through defense counsel concerning the time periods they had been with Dr. McMunn on September 10, 1984. In response to the questions relayed through defense counsel, neither Mrs. Porter nor Mrs. Hare, two years after the event, could recall the periods of time spent with Dr. McMunn on September 10, 1984. One stated that she arrived about 12:30 p.m.; the other, about 2:00 p.m. Both stated that they could recall nothing unusual that day.

At trial, Dr. McMunn sought to testify that he could not have been engaged in the extraction procedure from 12:00 noon until 2:30 because he was working on other patients during a large part of that time. Plaintiff's counsel moved to exclude the testimony on the ground that Dr. McMunn should be limited to the same evidence to which the protective order had limited the plaintiff — the inconclusive statements of Mrs. Porter and Mrs. Hare. The court granted the motion, ruling that the limitations imposed by the protective order, which Dr. McMunn had sought, in combination with Dr. McMunn's representation that the visits of all other patients were irrelevant, reduced the area of relevancy to the visits of the two patients named.

The statements of those patients failed to disclose whether they were ever seen by Dr. McMunn personally, or treated by someone else in his office. Further, in a hearing outside the jury's presence, Dr. McMunn testified, in effect, that he had no direct recollection

of the times spent with individual patients on the day in question, that the relevant appointment book would have been the best evidence, but it had disappeared, and that he had endeavored to reconstruct the events of the day from his billing records. He said that all patients' problems were different, and that there was no fixed office routine which governed his work. Thus, he could not extrapolate from the billing records what he had been doing between noon and 2:30 p.m.

We do not think the court's exclusion of the proffered testimony amounted to an abuse of discretion. The question presented is one of relevancy. We have defined as relevant "every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue." *Va. Real Estate Comm.* v. *Bias*, 226 Va. 264, 270, 308 S.E.2d 123, 126 (1983). Nevertheless, the application of that criterion to proffered evidence involves the exercise of the trial court's discretion. *Peacock Buick* v. *Durkin*, 221 Va. 1133, 1136, 277 S.E.2d 225, 227 (1981). In the circumstances of this case, it was well within the scope of that discretion to determine that Dr. McMunn's proffered testimony would have no tendency to establish either the probability or the improbability of the fact in issue.

## III. HEARSAY AS BASIS FOR EXPERT OPINION

During the two months before her admission to Duke, Mrs. Tatum was treated by Dr. Ghulam Qureshi, a hematologist practicing at the Medical College of Virginia. During the course of his treatment, Dr. Qureshi attributed the patient's continued bleeding to a platelet disorder known as von Willebrand's disease. At trial, however, he was called as an expert witness for Dr. McMunn. He then testified that he had changed his opinion and had come to the conclusion that Mrs. Tatum's bleeding was not caused by any organic disease but was self-induced. He told the jury that he thought the bleeding was caused by Mrs. Tatum's mechanical abuse of the wound with her finger or a toothbrush, and that he had ruled out the existence of von Willebrand's disease.

Plaintiff's counsel objected to this testimony. In a hearing outside the jury's presence, Dr. Qureshi said that his opinion was partially based upon a record of Mrs. Tatum's treatment for iron deficiency anemia at the Mayo Clinic in 1981, where a physician had appended a note raising "the possibility of a factitious disease, you know, self-induced . . . ." The physician at Mayo was

quoted as having said, in his note, "There are patients who like to be patients." Dr. Qureshi also referred to an entry in the medical records at Duke, relating that a nurse there had seen Mrs. Tatum insert her fingers into her mouth.[1]

The court ruled that Dr. Qureshi could state his opinion that Mrs. Tatum's injuries were self-inflicted, and could rely on the medical records from the Mayo Clinic and Duke with respect to factual matters, but that he could not express the opinions of other physicians because they were not available for cross-examination. He was specifically precluded from giving the opinion of the physician at the Mayo Clinic to the effect that Mrs. Tatum might have experienced "factitious disease" while there in 1981, and from telling the jury, in effect, that "other doctors agree with me."

Dr. McMunn assigns error to this ruling, citing Code § 8.01-401.1.[2] He argues that the use of hearsay as the basis of expert opinion is realistic, because it reflects the fact that physicians, in reaching a diagnosis, frequently must rely on reports giving the opinions of other professionals who are not present for face-to-face interview. Also, he contends, the introduction of such hearsay opinions serves the cause of judicial economy, avoiding the expense and time which would be consumed by bringing to court all authors of opinions upon which the expert depended.

Mrs. Tatum responds that the statement concerning "factitious disease" was expressed as mere conjecture by its author at the Mayo Clinic, and in any event, it was a collateral fact, arising out of an unrelated hospitalization in 1981, thus irrelevant to the issue

---

[1] Dr. Angelillo, a physician responsible for Mrs. Tatum's treatment at Duke, testified that he asked Mrs. Tatum about this at the time and she explained that she was carrying out Dr. Angelillo's own instruction to hold a sponge on the wound and exert gentle pressure to stop the bleeding.

[2] Code § 8.01-401.1: In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

on trial. Furthermore, she argues, the existence of "factitious disease" would be within the field of psychiatry, and not within "the particular field of expertise" — hematology — within which Dr. Qureshi was qualified. Thus, she says, the excluded evidence did not fall within the scope of Code § 8.01-401.1.

 Code § 8.01-401.1 was based, with minor alterations, upon Federal Rules of Evidence 703 and 705.[3] Therefore, the construction given to those rules by the federal courts is instructive. It is apparent from the language of Fed. R. Evid. 703 that its purpose was to authorize the admission into evidence of the opinions of experts testifying in court, notwithstanding the fact that the opinions were based upon inadmissible information, provided such information is of the kind reasonably relied upon by other experts in the witness' particular field of expertise. The federal rules are silent, as is our statute, with respect to the admissibility of the otherwise inadmissible information upon which the expert's opinion is based, at least upon the expert's direct examination. The federal courts have treated this as a *casus omissus*, and have divided on the question whether traditional rules of evidence require the exclusion of hearsay offered on direct examination of an expert as the basis of his opinion; the majority hold that it should be excluded. *See, e.g., Marsee* v. *U.S. Tobacco Co.*, 866 F.2d 319, 323 (10th Cir. 1989) (not error to exclude hearsay as basis for opinion); *Bryan* v. *John Bean Division of FMC Corp.*, 566 F.2d 541, 544-47 (5th Cir. 1978) (error to admit such hearsay basis — lacking "guarantee of trustworthiness"); *Rose Hall, Ltd.* v. *Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 158 (D. Del. 1983), *aff'd without opinion* 740 F.2d 958 (3rd Cir. 1984), *cert. denied* 469 U.S. 1159 (1985) (hearsay basis for opinion excluded); *cf. O'Gee* v. *Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2nd Cir. 1978) (implication that such evidence might be admissible).

---

[3] Fed. R. Evid. 703: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed. R. Evid. 705: The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The text of Code § 8.01-401.1 gives it no broader scope than that of the parent federal rules, and we will not attribute to the General Assembly any purpose beyond that which motivated the federal drafters. The admission of hearsay expert opinion without the testing safeguard of cross-examination is fraught with overwhelming unfairness to the opposing party. No litigant in our judicial system is required to contend with the opinions of absent "experts" whose qualifications have not been established to the satisfaction of the court, whose demeanor cannot be observed by the trier of fact, and whose pronouncements are immune from cross-examination.

In *Gaalaas* v. *Morrison*, 233 Va. 148, 157-58, 353 S.E.2d 898, 903 (1987), we were presented with the question whether a hearsay foundation related as a basis for an expert opinion was fact or opinion. We determined that the admission of the hearsay, if it was opinion, was harmless error under the circumstances of that case. We now hold that Code § 8.01-401.1 does not authorize the admission in evidence, upon the direct examination of an expert witness, of hearsay matters of opinion upon which the expert relied in reaching his own opinion, notwithstanding the fact that the opinion of the expert witness is itself admitted, and notwithstanding the fact that the hearsay is of a type normally relied upon by others in the witness' particular field of expertise. Thus, the trial court, while permitting Dr. Qureshi to state his own conclusions, correctly excluded the hearsay opinions upon which he relied.

## IV. PROOF OF NECESSITY OF MEDICAL EXPENSES

Mrs. Tatum offered in evidence an exhibit consisting of 49 pages of medical, hospital, and pharmaceutical bills attached to a summary sheet which totalled them. Mrs. Tatum testified that during her 169 days of hospitalization, she was treated for conditions unrelated to her claim against Dr. McMunn.[4] Mrs. Tatum went through the bills and deleted all charges she considered unrelated to the claim against Dr. McMunn. Her summary showed a total of $102,687.48 in bills received, from which she deducted $2,139.60 for unrelated charges, leaving a total of $100,547.88.

---

[4] The unrelated items included a mammogram, continuing therapy for her collagen vascular disease, and treatment for gastrointestinal problems.

Mrs. Tatum testified that she had received the bills, but did not qualify as an expert witness.

Dr. McMunn objected to this evidence on the ground that it lacked a foundation to show that the expenses claimed were necessarily incurred as a result of the negligence charged to Dr. McMunn. The court admitted the exhibit through Mrs. Tatum's oral testimony on the basis of our holding in *Walters v. Littleton*, 223 Va. 446, 290 S.E.2d 839 (1982). Dr. McMunn stipulated to the authenticity of the bills before trial, and at trial conceded that they were reasonable in amount. He disputes the plaintiff's claim that they were rendered medically necessary by any act or omission on his part, and argues on appeal that *Walters* is not authority for the admission of medical bills without expert proof of medical necessity and causal relationship, where those questions are in issue.

In *Walters*, plaintiff's counsel attempted to introduce ambulance, medical, and hospital bills through the unsupported testimony of the plaintiff. The defendant objected on the ground that the evidence lacked the requisite foundation showing of reasonableness. The trial court excluded the bills, as well as the plaintiff's oral testimony as to their amount, on the ground that the plaintiff was not "a proper witness to admit" the bills. We reversed, saying:

> With the proviso that a proper foundation must precede introduction of the bills, we agree with the reasoning of those courts which have held that evidence presented by bills regular on their face of the amounts charged for medical service is itself some evidence that the charges are reasonable and necessary. Whether the bills and the foundation for their admission are sufficient to create a jury issue on reasonableness in a particular case, however, will depend upon the facts of the case.

*Id.* at 452, 290 S.E.2d at 842 (citations omitted). We observed that the plaintiff had explained the nature and details of the treatment he received, and that "[t]he injuries were minor, the treatments simple, and the amounts charged totalled less than $600. On these facts we cannot say as a matter of law that a jury could not have been justified in concluding that the bills were reasonable." *Id.* We concluded that exclusion of the bills "in claims such

as Walters' " might deny access to the courts to parties "with meritorious but small claims." *Id.* at 452, 290 S.E.2d at 842-43.[5]

■ Proof of medical expenses by the introduction of bills through the sole testimony of the plaintiff requires consideration of four major components: (1) authenticity, (2) reasonableness in amount, (3) medical necessity, and (4) causal relationship. It is axiomatic that a defendant, whose liability for a plaintiff's damages has been established, is only responsible for those medical bills which are (1) authentic, *i.e.*, accurate statements of charges actually made by those who provided the services to the plaintiff for which recovery is claimed; (2) reasonable, *i.e.*, not excessive in amount, considering the prevailing cost of such services; (3) medically necessary, *i.e.*, reasonably necessary in the opinion of experts qualified in the appropriate field to cure the plaintiff, ameliorate his injuries, or relieve his suffering, not the product of overtreatment or unnecessary treatment; and (4) rendered necessary solely by a medical condition proximately resulting from the defendant's negligence, not by an unrelated or preexisting condition except to the extent such a condition was aggravated by the defendant's negligence.

We have examined the records of this Court in *Walters*. Although counsel in that case in their briefs made passing reference to necessity and causal relationship, and although our opinion mentioned necessity in the passage quoted above, it does not appear that either of those components was seriously contested. Counsel argued the case here, as they did in the trial court, on the issues of the first two components. *Walters* stands only for the propositions (1) that a plaintiff's testimony that he has received bills regular on their face and consistent with his testimony as to his injuries and treatment is sufficient to show that the bills "came from the sources claimed," *absent a challenge to authenticity, id.* at 451-52, 290 S.E.2d at 842; and (2) that the introduction of bills of the kind described above is "some evidence" that they are reasonable in amount. *Id.* at 452, 290 S.E.2d at 842.

---

[5] Our view was in accord with legislative enactments permitting proof of property damage to motor vehicles and proof of medical expenses in general district court cases by the introduction of reports without expert testimony. *See* Code §§ 8.01-416 and 16.1-88.2. Both statutes were adopted before our decision in *Walters*. Since that time, the General Assembly has not seen fit to enlarge the limited applicability of those sections.

■ *Walters* is not authority for the proposition that the introduction of such bills furnishes sufficient evidence of either medical necessity or causal relationship to create a jury issue, unless the case is one, like *Walters*, in which those issues are substantially uncontested.[6] The reason for the distinction is apparent. The question of authenticity is subject to verification from lay sources. A defendant may easily satisfy himself on this point during pretrial discovery. Reasonableness, although less easily determined, may also be ascertained from non-expert sources. Government agencies, insurance carriers, and others, are continually engaged in comparative studies of prevailing medical costs.

■ The question whether a particular treatment is medically necessary, however, and the often more difficult question whether it is causally related to a condition resulting from some act or omission on a defendant's part, can usually be determined only by a medical expert qualified in the appropriate field who has studied the plaintiff's particular case. The mere receipt of bills regular on their face by a plaintiff furnishes no evidence of medical necessity or causal relationship. The unfairness to the defendant of receiving such proof without expert foundation in a case of the kind now before us is obvious.

■ We now hold that where the defendant objects to the introduction of medical bills, indicating that the defendant's evidence will raise a substantial contest as to either the question of medical necessity or the question of causal relationship, the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship, or both, as appropriate.[7]

■ In sum, a plaintiff may offer medical bills through the plaintiff's testimony alone if he lays a foundation showing (1) that the bills are regular on their face, and (2) that they appear to relate to treatment, the nature and details of which the plaintiff has explained. If the defendant challenges the authenticity of the

---

[6] The issues of medical necessity and causal relationship are substantially uncontested where a defendant who intends to offer no evidence on those issues merely objects to the medical bills for the purpose of "putting the plaintiff to his burden of proof."

[7] A plaintiff's testimony that he sustained injury as a result of an accident and that he was disabled thereby, has consistently been held admissible without any requirement of expert testimony as to causal connection. *Todt* v. *Shaw*, 223 Va. 123, 126-27, 286 S.E.2d 211, 213 (1982). That rule, however, does not apply to bills for claimed medical expenses.

bills, they will be insufficient in themselves to create a jury issue, and independent proof of authenticity will be necessary. If the defendant challenges only their quantitative reasonableness, a jury issue is created on that question. The jury may then consider the bills as "some evidence" of their quantitative reasonableness, to be weighed against such evidence as the defendant may present on that question. If the defendant contests their medical necessity or causal relationship and further represents to the court that the defense will offer evidence on those issues, the bills will be insufficient in themselves to create a jury issue, and expert foundation testimony will be prerequisite to their admission.

We have carefully examined the record in the present case in light of the foregoing rules. Dr. Angelillo expressly testified to the medical necessity and causal relationship of all the bills incurred at Duke. The medical necessity and causal relationship of the bills incurred at the Medical College of Virginia were sufficiently established by the testimony of the treating physicians who cared for the plaintiff there, as well as by the testimony of the defense witnesses, Dr. Qureshi and Dr. McMunn himself. Dr. McMunn referred the plaintiff to the Medical College of Virginia for treatment for her continued pain and bleeding. The evidence showed that the physicians who treated her for those conditions considered their treatment, at the time, to be both medically necessary and the proximate consequences of Dr. McMunn's original oral surgery. Thus, although the trial court's reliance upon *Walters* was misplaced in admitting the contested bills without expert foundation support, the court did not err in the circumstances of this case because sufficient expert foundation for the bills appears elsewhere in the record.

Finding no reversible error in the record, we will affirm the judgment.

*Affirmed.*

COMPTON, J., dissenting in part.

The length of the extraction procedure was a crucial issue relating to the standard of care. The plaintiff was allowed full latitude in presenting evidence regarding the time consumed by the procedure. Nevertheless, the trial court precluded the defendant from rebutting this evidence when it refused to allow the defendant to

testify that he had treated other patients during the time period in question. In my opinion, this was error.

Unfortunately, the majority decides this evidentiary question wholly on the basis that there was no "abuse of discretion" in excluding the testimony. The proffered evidence was competent, material, relevant and probative, prohibited by no specific rule; it should have been admitted under elementary principles of evidence. In effect, the majority argues that the testimony was entitled to little weight. I would leave that consideration to the jury where it properly belongs.

In my view, exclusion of the evidence amounted to reversible error. Thus, I would reverse the judgment below and remand the case for a new trial.

CARRICO, C.J., joins in dissent.