Present:  Hassell, C.J., Keenan, Kinser, Lemons, Agee, and
Goodwyn, JJ., and Russell, S.J.

JAYA LEE BOSTIC, BY
HER MOTHER AND NEXT FRIEND,
MELANIE M. BROCK                              OPINION BY
                                      SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 070410                         April 18, 2008

ABOUT WOMEN OB/GYN, P.C., ET AL.

            FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                      LeRoy F. Millette, Jr., Judge

    The sole question presented by this appeal is whether the

circuit court erred in permitting the defendant, at a jury

trial in a medical malpractice case, to read and exhibit

excerpts from medical literature without proper foundation or

cautionary instructions.

                          Facts and Proceedings

    Melanie M. Brock was the mother of a child, Jaya Lee

Bostic, delivered at Potomac Hospital in Prince William County

on May 8, 2000.  Immediately after delivery, Jaya was

diagnosed with Erb's palsy, a permanent paralysis of the arm.[1]

The cause of the palsy was determined to be shoulder dystocia

during delivery, an obstetric emergency in which the child's

---

[1] Erb's palsy is a condition resulting in decreased
mobility and functionality of an affected upper extremity.
Harrison v. United States, 284 F.3d 293, 296 n.1 (1st Cir.
2002).  The condition is recognized to be permanent.  Harrison
v. United States, 233 F.Supp.2d 128, 130 (D. Mass. 2002).

shoulder becomes trapped behind the mother's pubic bone.[2]  If

not promptly relieved, shoulder dystocia can result in

stretching and avulsion of the cervical nerve roots in the

child's brachial plexus,[3] the undisputed cause of the child's

injury in this case.

The mother, as next friend, brought this action on the

child's behalf against About Women, OB/GYN, P.C. and Nancy

Kuney, a certified nurse midwife who attended the mother

during the delivery.

The foregoing facts are undisputed.  The issue in the

case is whether the child's injury resulted from Nurse Kuney's

negligence or from maternal propulsive forces of labor.  The

plaintiff contends that the nurse midwife subjected the

child's head to excessive downward traction during delivery,

causing the stretching and avulsion of cervical nerves.  The

defendants contend that Nurse Kuney adhered to the appropriate

standard of care and that the child's injury resulted from the

propulsive forces of labor.

---

[2] See Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary 235 (citing Mulligan v. Shuter, 419 N.Y.S.2d 13, 14 (N.Y. App. Div. 1979) (describing "condition known as shoulder dystocia").

[3] "Brachial plexus" refers to the nerves that come down from the spine in the region of the neck and proceed down the arm. See The Sloane-Dorland Annotated Medical-Legal Dictionary 556 (citing Pisciotta v. Allstate Ins. Co., 385 So.2d 1176, 1181 (La. 1979)).  "Avulsion" is the tearing away of a part of an anatomical structure. Id. at 74.

At a jury trial, the plaintiff produced expert medical testimony that the child's injury was the result of Nurse Kuney's application of excessive force to the child's head during delivery and that maternal propulsive forces of labor could not account for a permanent Erb's palsy.  The defendants called Nurse Kuney as a fact witness but not as an expert on either the standard of care or on causation.  Plaintiff's counsel, in her cross-examination, asked Nurse Kuney whether she agreed or disagreed with several excerpts from medical literature that had been admitted during the plaintiff's case.  During redirect examination, defense counsel asked her further questions concerning the same excerpts.  Then defense counsel turned to articles that had not been relied upon or established as reliable authority by any witness, and asked Nurse Kuney:

> Q.  "*Obstetrics and Gynecology*, Erb's Palsy, 1999.
> The overwhelming evidence indicts the propulsive
> nature of the stretching of the involved nerves over
> which the birth attendant has no control.
> *Obstetrics and Gynecology*, 2000."  Do you agree with
> that?
>
> A.  Yes.
>
> . . . .
>
> Q.  Erb's palsy causation.  During the past – this
> is in the *Journal of Reproductive Medicine* of 2005.
>
> [Plaintiff's counsel]:  If Your Honor, please, let
> me note an objection here.  There is no expert that

they're putting on that's going to testify to this conclusion.

[Defense counsel]: Dr. Feore will.

[Plaintiff's counsel]: No, he isn't, not if he's going to be consistent with his deposition.

[Defense counsel]: This is not standard of care. This is on causation.

Defense counsel resumed his redirect examination by continuing his quotation of the article:

"During the past 15 years studies have provided considerable indirect evidence that maternal propulsive forces are responsible for the injury leading to Erb's palsy."

[Plaintiff's counsel]: Just note my objection.

[The court]: I'll allow the question and give a curative instruction if Dr. Feore doesn't testify to that.

[Defense counsel]: Do you agree with that [, Nurse]?

A. Yes.

The defendants thereafter called Dr. J. Colman Feore, who qualified as an expert witness on the standard of care in the field of obstetrics and gynecology as well as the issue of causation in these fields. He testified that, from his review of the records and pre-trial depositions, Nurse Kuney had comported with the appropriate standard of care in the delivery of the child. He further testified that he was unable, however, to form an opinion as to the cause of the child's Erb's palsy:

4

Q. But, Doctor, she had – there's a permanent injury. Doesn't that mean by definition you had to pull too hard?

A. No, it doesn't mean that. It means that there was pressure on the shoulder that created the Erb's palsy, in fact, affecting the brachial nerves in the neck. But that was caused by pressure of the shoulder against the pubic bone. Whether it came from the traction or downward of the baby's head or whether it was caused by other forces, I don't know. I don't think anybody can say that because, you know, during the labor process, everything is coming into the pelvis; and as the head progresses down, the body may not because the shoulders are caught on the pelvis and so as the head comes down, you get the stretching. So that stretching occurs during the labor process during contraction, so I couldn't say one way or the other.

Defense counsel then exhibited to the jury, in the form of a projected slide, an article from the *Journal of Reproductive Medicine*, 2005, entitled "Erb's Palsy Causation: Iatrogenic or Resulting from Labor Forces?" Plaintiff's counsel objected that the article should not be shown to the jury until a foundation had been laid. The court responded, "Proceed." Defense counsel asked the witness if the article was "reasonably reliable on issues causing shoulder dystocia." The witness answered in the affirmative. Defense counsel then asked the witness if he agreed with the article. Plaintiff's counsel again objected: "In order to use any treatise on direct, this witness has to say two things: One, that . . . he's relying upon these in forming his opinions and he finds the treatise to be reliable and authoritative. . . . until he

5

says his opinions were based upon the article, he can't use it on direct."  The court directed defense counsel to "[a]sk the question."  Defense counsel then further examined the witness:

Q.  Doctor, in reaching your opinions in this case, is that something you relied upon to talk to this jury?

A.  Yes.

Q.  Now, try again.  Do you agree with the following:  "During the past 15 years, studies have provided considerable indirect evidence that maternal propulsive forces are responsible for the injury leading to Erb's palsy."  Do you agree with that?

A.  I would use the word "could be responsible."

Plaintiff's counsel then cross-examined Dr. Feore as follows:

Q.  Now, when did you arrive at the theory that an Erb's palsy injury in this case was caused by the propulsive forces of labor coming down the birth canal?

A.  I didn't arrive at that conclusion.

Q.  In fact, that didn't happen at all in this case; did it, Doctor?

A.  I don't know if it did or not.  That's the whole point.

. . . .

Q.  So that I'm clear, are you saying that it's your opinion in this case that the propulsive forces of labor, regardless of where this fetus was in the birth canal, the propulsive forces of labor are what the cause of the injury is?

6

A. What I'm saying is they could have been, not that they were.

Q. I want to know within a reasonable medical degree of probability whether that's your opinion. I'm not interested in possibility.

A. There is no reasonableness involved in this because we do not know. The baby was delivered and the baby had a Erb's palsy when it came out. What the cause of that particular Erb's palsy, I do not know.

Nevertheless, the witness reiterated his opinion that Nurse Kuney had adhered to the appropriate standard of care.

Dr. Feore was the defendants' only expert witness on causation and the last witness to testify at trial. After his testimony, the court recessed for the evening. The following morning, when the court met with counsel to consider jury instructions, plaintiff's counsel asked for a curative instruction to caution the jury to disregard the findings contained in the article to which he had objected, on the ground that no foundation had been laid for its admission as substantive evidence. The court refused the curative instruction, observing that the request came too late. In final argument, defense counsel read to the jury the article objected to by the plaintiff, displayed it on a projected slide, and said: "This is all in the literature. I'm not making this up. It's not a suspicion."

7

The jury returned a verdict for the defendants and we awarded the plaintiff an appeal.

## Analysis

Code § 8.01-401.1 was amended in 1994 to add the following paragraph:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals or pamphlets on a subject of history, medicine or other science or art, established as a reliable authority by testimony or by stipulation shall not be excluded as hearsay. If admitted, the statements may be read into evidence but may not be received as exhibits. If the statements are to be introduced through an expert witness upon direct examination, copies of the statements shall be provided to opposing parties thirty days prior to trial unless otherwise ordered by the court.

We interpreted this paragraph in Weinberg v. Given, 252 Va. 221, 476 S.E.2d 502 (1996), in which we held that the General Assembly had, in enacting it, made a substantive change in the law of hearsay, permitting the reading of learned treatises to the fact-finder as substantive evidence "in certain limited instances" and "provided no other evidentiary rule prohibits such admission." Id. at 226, 476 S.E.2d at 504. In Weinberg, we quoted our earlier decision in McMunn v. Tatum, 237 Va. 558, 379 S.E.2d 908 (1989), in which, applying the former statute in the light of the common-law rules against hearsay, we held that an expert witness could

not express the opinions of other physicians who were not available for cross-examination:

> The admission of hearsay expert opinion without the testing safeguard of cross-examination is fraught with overwhelming unfairness to the opposing party. No litigant in our judicial system is required to contend with the opinions of absent 'experts' whose qualifications have not been established to the satisfaction of the court, whose demeanor cannot be observed by the trier of fact, and whose pronouncements are immune from cross-examination.

Weinberg, 252 Va. at 225, 476 S.E.2d at 503 (quoting McMunn, 237 Va. at 566, 379 S.E.2d at 912.)

In enacting the 1994 amendment to Code § 8.01-401.1, the General Assembly was clearly aware of those dangers and sought to avoid them by inserting two preconditions to the admission of hearsay expert opinions as substantive evidence on direct examination:  First, the testifying witness must have "relied upon" the statements contained in the published treatises; second, the statements must be established as "a reliable authority" by testimony or by stipulation.  As we said recently in construing this same paragraph of Code § 8.01-401.1, "we must give effect to the legislature's intention as expressed by the language used in the statute unless a literal interpretation of the language would result in a manifest absurdity."  Budd v. Punyanitya, 273 Va. 583, 591, 643 S.E.2d 180, 184 (2007)(citing Boynton v. Kilgore, 271 Va. 220, 227, 623 S.E.2d 922, 925-26 (2006); Williams v.

Commonwealth, 265 Va. 268, 271, 576 S.E.2d 468, 470 (2003); and Woods v. Mendez, 265 Va. 68, 74-75, 574 S.E.2d 263, 266 (2003)).  When the language of a statute is unambiguous, we are bound by the plain meaning of that language.  Campbell v. Harmon, 271 Va. 590, 597-98, 628 S.E.2d 308, 311-12 (2006); Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., 271 Va. 304, 309, 626 S.E.2d 436, 438 (2006).

By inserting those qualifications, the General Assembly insured that the testifying witness fully vouched for the opinions of the absent authors of the articles and was prepared to withstand the test of cross-examination on the truthfulness and accuracy of their statements.  If the testifying witness does not, based upon his own knowledge and expertise, fully accept the views of the absent author, but simply reads them into the record as holy writ, the opposing party is subjected to the "overwhelming unfairness" we discussed in McMunn.[4]

---

[4] An example of this occurred in the present case.  In Dr. Feore's direct examination, defense counsel read from an article discussing the pounds of pressure exerted by maternal forces of labor.  Asked if he agreed with the article, the witness replied:  "It does affect my opinion, but these people are using some engineering processes to determine these things.  I'm not an engineer.  But numbers like that have been quoted, so I have to believe it."  No engineering testimony was offered, so these opinions were immune from the test of cross-examination.

"Statutes in derogation of the common law are to be strictly construed and not to be enlarged in their operation by construction beyond their express terms." Isbell v. Commonwealth, 273 Va. 605, 613, 644 S.E.2d 72, 75 (2007); see also Fruiterman v. Waziri, 259 Va. 540, 544, 525 S.E.2d 552, 554 (2000) and Schwartz v. Brownlee, 253 Va. 159, 166, 482 S.E.2d 827, 831 (1997). We therefore interpret the 1994 amendment to Code § 8.01-401.1 as a relaxation of the common-law rules against hearsay only to the limited extent provided by the express statutory terms. So construed, the precondition that the testifying witness must have "relied upon" the published article before it may be read into evidence does not mean that he accepts it only partially and is unwilling fully to subscribe to its views.[5] The statutory standard is not met by an expert's testimony that he relied upon it only to use "to talk to this jury," as the testifying witness did in the present case. The statutory term means that the witness must testify that he relied on the article in forming his opinion, which is consistent with the views

---

[5] As noted above, during Dr. Feore's direct examination, defense counsel asked him whether he agreed with the following statement contained in one of the articles to which the plaintiff had objected: "[M]aternal propulsive forces are responsible for the injury leading to Erb's palsy." Dr. Feore responded: "I would use the word[s] 'could be' responsible." (Emphasis added.)

expressed by the absent author.  Any enlargement of the statutory limitations leads to the evils mentioned in McMunn and Weinberg, which the General Assembly clearly sought to avoid.

Viewed by that standard, an insufficient foundation was laid for the reading of the articles objected to.  Dr. Feore was candidly uncertain as to causation, and was unable to choose between two possible causes provided by the other evidence:  Excessive traction on the child's head at birth or maternal propulsive forces.[6]  Nevertheless, the defense was allowed to read to the jury opinions of absent authors to the effect that maternal propulsive forces were the cause of Erb's palsy, to the exclusion of all other causes, to display the articles on projected slides, and to argue that opinion to the jury as a fact in evidence.  No expert witness testified to that view, the jury was unable to see and hear the author who expressed it, and the plaintiff was, of course, unable to subject the opinion to the test of cross-examination.

We do not agree with the circuit court's conclusion that the plaintiff's request for a cautionary instruction came too late.  Plaintiff's counsel noted an objection when the defense

---

[6] Some of the literature read to the jury mentioned uterine malformation as a third possible cause of Erb's Palsy, but no witness expressed the opinion that such a condition existed in the present case.

12

first attempted to introduce the articles. The defense asserted that Dr. Feore would testify to the conclusion expressed in the articles. The court admitted the articles conditioned upon Dr. Feore's subsequently doing so and stated, "I'll allow the question and give a cautionary instruction if Dr. Feore doesn't testify to that." Plaintiff's counsel could not determine whether Dr. Feore would indeed endorse the views expressed in the article (thus changing the opinion he had expressed in his deposition) until his testimony was completed at trial. When Dr. Feore failed to endorse the view of the author of the article, plaintiff's counsel had every reason to expect that the court would grant the cautionary instruction that had been promised in just that eventuality. Counsel reiterated his request for the instruction at the first opportunity after Dr. Feore's testimony was completed.[7]

## Conclusion

---

[7] The reliance of the defense on our recent decision in Bitar v. Rahman, 272 Va. 130, 630 S.E.2d 319 (2006), in this respect, is misplaced. There, we found an objection to the admissibility of expert testimony to be too late when it was first made after the witness had completed his testimony and left the trial. As we pointed out in Bitar, if an objection is made when the objectionable evidence is first offered, as was done here, a motion to strike it made at the end of the offering party's case is timely. Further, a motion to strike is timely when made after a witness has completed his testimony if his reliance on unfounded assumptions only then becomes clear. Id. at 140, 630 S.E.2d at 324-25.

13

For the reasons stated, we conclude that the circuit court erred in admitting the opinions contained in published medical literature without an adequate foundation as required by Code § 8.01-401.1.

Because we cannot determine to what extent the erroneous admission of the hearsay opinions stated in the published articles may have affected the verdict, we will reverse the judgment appealed from and remand the case for a new trial consistent with this opinion.

<u>Reversed and remanded</u>.

14