COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Chaney and Raphael
Argued at Winchester, Virginia


RONALD C. DEVINE

MEMORANDUM OPINION[*] BY
v.        Record No. 0554-22-4          JUDGE STUART A. RAPHAEL
DECEMBER 6, 2022

KEVIN KILEY AND
  LAUREN KILEY


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

James F. Davis (James F. Davis, PC, on briefs), for appellant.

John Spurlock-Brown (T. Wayne Biggs; Dycio & Biggs, on brief),
for appellees.


Kevin Kiley and his wife sued Ronald C. Devine for fraudulent inducement, breach of

contract, and conversion. The Kileys alleged that Devine defrauded them into investing

$499,000 in Devine's NASCAR business, BK Racing, LLC, after promising to invest their

money in a real estate venture instead. After a three-day trial, the jury found in favor of Kevin

Kiley on the fraud-in-the-inducement claim, awarding him compensatory and punitive damages.

On appeal, Devine asserts that the trial court erred by denying his motions to strike and his

motion to set aside the verdict or order a new trial. Devine also contends that the trial court erred

by refusing his proffered jury instruction that a member of a limited liability company cannot be

held liable solely because of such membership. We find no error in the trial court's decision not

to give Devine's requested jury instruction. And because the evidence, taken in the light most

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

favorable to the plaintiffs, supports the jury's conclusion that Devine fraudulently induced Kiley to advance $499,000, we affirm the judgment.

BACKGROUND

"Pursuant to Code § 8.01-680, the standard of review for determining the sufficiency of evidence on appeal is well established." *Sidya v. World Telecom Exch. Commc'ns, LLC*, ___ Va. ___, ___ (Mar. 24, 2022) (quoting *Nolte v. MT Tech. Enters., LLC*, 284 Va. 80, 90 (2012)). "The reviewing court must examine the evidence in the light most favorable to . . . the prevailing party at trial, and the trial court's judgment will not be disturbed unless it is plainly wrong or without evidence to support it." *Id.* at ___ (quoting *Nolte*, 284 Va. at 90).

By 2016, the Devine and Kiley families had been friends for about twenty years. Devine was a successful entrepreneur who owned several businesses, including fast-food franchises and companies that funded and serviced real-estate-development loans. In the early 2000s, Devine included Kevin Kiley as an investor in certain real estate loans extended by Devine's financing company, Springfield Financial Services, LLC ("SFC"). Kiley invested $500,000, buying a fraction of larger notes held by SFC and secured by deeds of trust. When the notes were paid off, Kiley earned a sizable profit. Kiley testified that, although SFC held the notes, Devine "controlled the deals." When the real estate market "collapsed" in 2007, however, Kiley stopped investing with Devine.

Devine began racing cars and, in 2015, invested millions of dollars in NASCAR-related businesses. By 2016, Devine owned four racing teams and two racing franchises. He owned fifty percent of Virginia Racing Group ("VRG"). Together with VRG, he was one of five owners of BK Racing, LLC ("BKR"). Devine was also the president of BKR and controlled its financial decisions. In 2016, Devine and certain family trusts also owned and controlled BRC Loans, LLC ("BRC"), which, in turn, owned US Financial Companies, LLC ("US Financial").

But despite the fact that Devine invested $20 million in BKR and loaned it another $15 million, the company was still not profitable. By 2020, Devine was the sole member of VRG.

In April 2016, Devine asked Kiley for a "bridge loan" using a $499,000 bank loan that Kiley had originally planned to use to help his son purchase some rental property in Florida. Devine had introduced Kiley to James Kourouklis, a loan officer for Union Bank and Trust. While Union Bank was still considering the loan application, Kiley's son decided to use a line of credit on his parents' home to close the Florida transaction because he feared that the Union Bank loan might not close in time. Devine, who had been in frequent communication with Kiley, knew that Kiley's son might use alternative financing. Devine asked Kiley about using the Union Bank loan to invest in BKR instead. Kiley declined, saying that the racing industry was too risky. Once Devine learned that Kiley's son did not need the proceeds from the Union Bank loan, Devine's conversations with Kiley "became more intense," shifting from "consultation" to "salesmanship."

The night before Union Bank formally approved the loan, Devine emailed Kiley a copy of an unsigned "future advance promissory note" for $10,000,000. The note listed US Financial as the noteholder and BKR as the borrower. Devine also emailed Kiley an unsigned "future advance security agreement" between BKR and US Financial. The "future advance" documents were attached to a proposed "service agreement" between US Financial and Kiley, providing that BKR was the borrower on a $10,000,000 note, that Kiley owned a $500,000 share of the $10,000,000 note, and that the collateral for the note was a "Personal Guarantee by Ronald C. Devine." In the email, Devine told Kiley that they would "talk" after Kiley had reviewed "the investment doc." Kiley testified that he never bothered to review the documents once he saw that the investment involved BKR, since he had no desire to invest in the racing industry. He also knew by then that BKR was "having financial problems."

- 3 -

After rejecting the BKR proposal, Kiley spoke with Devine by phone. Devine explained that he needed Kiley's money and assured him that the funds "would be available to come back almost immediately." As alternatives to the BKR investment, Devine proposed West Virginia and Maryland real estate investments like those Kiley had made in the early 2000s. Devine told Kiley that the investments would generate the "same type of return" and involve the "same paperwork." He assured Kiley that the investments would be "guaranteed," would be secured by real estate, and would "be safe." According to Devine, the West Virginia investment involved real estate worth $5,000,000, the land was being developed for a supermarket, and other investors like Dwight Schar were already on board. Devine said that he and Schar, a former owner of SFC whom Kiley knew to be a successful businessperson, expected to receive $30,000,000 from the Royal Bank of Scotland. Devine called the Maryland investment "a slam dunk."

When Kiley stressed that he and his wife planned to move soon and "would probably need th[e] money back in a very short time," Devine said he would structure the loan as a "demand" note, payable on thirty days' notice. Devine also assured Kiley that the value of the real estate securing the loan would be higher than the loan amount. He said that the "real estate agreement . . . was right on the edge, [and] he needed the money." Devine said he would give Kiley the supporting paperwork within three days. Based on Devine's description of the collateral, their former dealings, and Devine's assistance to Kiley's son with the Union Bank introduction, Kiley agreed that Devine could use the Union Bank loan proceeds in the real estate ventures.

Once Union Bank extended the loan to Kiley, Devine said that he needed the money immediately and provided Kiley with details on a US Financial bank account. Kiley instructed Union Bank to transfer the $499,000 loan proceeds to US Financial. Kiley believed that US

Financial was the equivalent of SFC, the company that had serviced his earlier investments with Devine. The next day, without telling Kiley, Devine redirected the Union Bank loan proceeds to BKR and BRC. Devine testified that all the funds were eventually transferred to BKR, as "money went back and forth between BK Racing and BRC Loans."

By June 3, 2016, however, Kiley had heard little from Devine and had not received the supporting documents Kiley had promised. Kiley texted Devine with a one-word question: "Paperwork?" Devine responded that he had the "agreement." But when Kiley had still not received the documents by June 7, he suspected that Devine had used the funds to invest in BKR. Kiley emailed Devine and reiterated that "[t]he deal was represented as a real estate investment with property and personal guarantees as security as we had in the past." He stressed that he had no interest in investing in either US Financial or BKR and that he did not want to risk his home in those ventures. He said that he and his wife "never intended to be in the NASCAR business and were never expecting that BK would be involved." Kiley stressed that more than a month had passed since the funds were transferred, and he "need[ed] some clarity and guarantee that our money and home are not at risk." Devine replied a couple of hours later, attaching a BKR loan agreement with a cover email stating, "2nd try."

Kiley did not sign the agreement. Kiley emailed Devine and asked him to call, emphasizing that "[t]he half million dollars is just sitting out there with no mutual agreement." Devine responded that he was racing in Sonoma and asked if they could "finish it" upon his return "next week." When Devine returned to Virginia, he met Kiley and presented him with the same service agreement for the BKR loan. He also presented a check for $17,000. A provision in the service agreement was checked that guaranteed the return of principal and interest to Kiley as "noteholder." Devine assured Kiley that he was "good for it" and that he had $30,000,000 to $60,000,000. He told Kiley that he "had a deal in the works" and could return Kiley's money

- 5 -

"almost immediately." Devine added that his money "was tied up in loans" and that, unless Kiley signed the agreement, "there was no other way" to return his funds.

Based on Devine's assurances, and fearing that Devine had placed his money where he could not access it, Kiley signed the service agreement to protect his investment. Devine signed the agreement as "President" of US Financial, the "Servicer." Kiley emailed Devine and thanked him for "address[ing] our concerns and the adjustment to guarantee the money against [his] personal assets."

Over the next seven months, Devine repeatedly assured Kiley that he would return his money. But by January 14, 2017, Kiley no longer received interest payments on his investment and BKR was in litigation. Kiley asked Devine to return the money. Instead, Devine offered to change the maturity date of the BKR note from December 2020 to December 2017. Lauren Kiley emailed Devine pleading to return the funds, saying that "the money was a personal loan to [Devine] and [that] it was secured by [him] personally." Lauren implored Devine to return their money.

Although Devine promised to return the money within two weeks, that deadline came and went. Lauren emailed Devine and stressed that "this needs to be over." Devine replied that he was "working on the many solutions we spoke about."

Devine never returned the $499,000 and never provided Kiley with a signed version of the paperwork he had promised. The Kileys sued Devine seeking the return of their investment, punitive damages, interest, and attorney fees. The jury returned a verdict in Kiley's favor on his fraudulent-inducement claim, awarding him $590,000 in compensatory damages and $289,000 in

punitive damages.[1]  The trial court entered judgment on the verdict but denied Kiley's request for attorney fees.  Devine noted a timely appeal.

## ANALYSIS

### A.  *Sufficiency of the evidence (Assignment of Error 1)*

Devine asserts that the trial court erred by denying his motions to strike the evidence and to set aside the verdict.  He argues that he had an "oral agreement" with Kiley for a "land deal" and the evidence shows that there was such an agreement between Kevin Kiley and US Financial.  He emphasizes that, "consistent with that agreement," Kiley directed Union Bank to transfer the loan proceeds to a US Financial account, and Kiley received payments under the written service agreement.  He says that Kiley's testimony was not credible because it was contradicted by the signed service agreement and by Kiley's own statement that "[t]he half million dollars is just sitting out there with no mutual agreement."  Finally, Devine maintains that the evidence failed to prove that he acted in his personal capacity, rather than as an agent for US Financial.  He argues that he was not a party to the service agreement and did not personally receive any funds from Kiley.

To prevail on a claim of actual fraud, a litigant "must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (2005) (quoting *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 85 (1999)); *see also Doe ex rel. Doe v. Baker*, 299 Va. 628, 655 (2021) (describing same elements).  A claim of fraud "cannot ordinarily be predicated on

---

[1] On Devine's motion, the trial court struck all of Lauren Kiley's claims and Kevin Kiley's conversion claim, leaving only Kevin Kiley's fraud-in-the-inducement and contract claims.  The trial court instructed the jury not to consider the contract claim if it found in Kevin Kiley's favor on the fraud claim.

unfulfilled promises or statements as to future events. Were the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362 (2010) (quoting *Lloyd v. Smith*, 150 Va. 132, 145 (1928)). But "if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (2008). "[T]he gist of fraud in such case is not the breach of the agreement to perform . . . ." *Abi-Najm*, 280 Va. at 362 (first alteration in original) (quoting *Boykin v. Hermitage Realty*, 234 Va. 26, 29 (1987)). Rather, "[t]he state of the promisor's mind at the time he makes the promise is a fact, and . . . if he represents his state of mind . . . as being one thing when in fact his purpose is just the contrary, he misrepresents a then existing fact." *Id.* at 363 (second and third alterations in original) (quoting *Boykin*, 234 Va. at 29); *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 677 (1985) ("[T]he promisor's intention—his state of mind—is a matter of fact.").

The record here shows that a reasonable jury could find clear and convincing evidence that Devine fraudulently induced Kiley to advance the $499,000 by misrepresenting that he planned to invest the funds in West Virginia and Maryland real estate ventures similar to the parties' past deals. Kiley testified that Devine represented that he needed Kiley's loan proceeds as a "bridge loan" that would be repaid promptly, that Devine would provide real estate investment documents within three days of receiving the money, and that Devine would personally guarantee the note. Based on those representations, Kiley orally agreed with Devine that he would invest $499,000. At Devine's direction, Kiley told Union Bank to transfer those funds into a US Financial account controlled by Devine. The jury could find that Devine's representations were false when made because Devine had no intention to invest the funds in the manner he promised. Instead, within twenty-four hours of the deposit, Devine transferred the

funds to BKR and other NASCAR-related companies that he controlled without telling Kiley about the transfer.

We disagree with Devine that Kiley's testimony was incredible. The jury's verdict is entitled to "the utmost deference." *Bussey v. E.S.C. Rests., Inc.*, 270 Va. 531, 534 (2005). We will not disturb the trial court's decision entering judgment on that verdict "unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 266 Va. 582, 590 (2003) (citing Code § 8.01-680).

> If there is conflict in the testimony on a material point, or if reasonable people could differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given to the testimony, the trial court may not substitute its conclusion for that of the jury merely because the judge disagrees with the result.

*Bussey*, 270 Va. at 534. "Because the jury's function is to determine the credibility of witnesses and the weight of the evidence, and to resolve all conflicts in the evidence, we will [affirm] the verdict on appeal if credible evidence supports the verdict." *Id.*

Kiley and Devine offered conflicting testimony about an oral contract to invest in real estate. The jury credited Kiley's account, and substantial evidence supports the jury's conclusion. Devine repeatedly pitched Kiley to invest in his racing business, and Kiley refused each time. Devine induced Kiley to part with $499,000 based on oral representations that the money would be invested in the West Virginia and Maryland real estate ventures. Yet the day after Kiley wired the funds, Devine diverted the money to BKR and BRC, the very investments that Devine knew Kiley had rejected. Those circumstances support the inference that when Devine promised to invest Kiley's money in the West Virginia and Maryland ventures, he had no present intention to perform. In addition, Kiley's written communications with Devine after he transferred the money corroborated Kiley's testimony by showing that he repeatedly asked Devine for documents reflecting their oral agreement. *See Lambert v. Commonwealth*, 70

Va. App. 740, 760 (2019) (holding that a witness's testimony was not inherently incredible when it was corroborated by other evidence, although corroboration was unnecessary). Although Kiley ultimately signed the BKR service agreement, he said he did so only after realizing that no real estate secured the loan, and because he relied on Devine's repeated representations that he would personally guarantee the loan and that the loan would be repaid quickly.

Given Kiley's explanation, which the jury credited, the fact that Kiley signed the BKR service agreement does not render his testimony inherently incredible. The evidence was competent, credible, and clear-and-convincing enough to prove that Devine falsely represented material facts about the investment, that the misrepresentations induced Kiley to transfer the Union Bank loan proceeds to Devine, and that Devine had a present intention not to perform his promise to invest the loan proceeds in the investments he had described.

We also reject Devine's argument that he could not be personally liable for fraudulent inducement because he was only an agent for US Financial. It is hornbook law that "[a]n agent is subject to liability to a third party harmed by the agent's tortious conduct." Restatement (Third) of Agency § 7.01 (2006). Thus, even when an agent, employee, or servant acts within the scope of his employment, he has "individual liability . . . for an *intentional* tort." *Fox v. Deese*, 234 Va. 412, 425 (1987); *see also VanBuren v. Grubb*, 284 Va. 584, 591 (2012) ("It has long been settled in Virginia that 'employers and employees are deemed to be jointly liable and jointly suable for the employee's wrongful act.'" (quoting *Thurston Metals & Supply Co. v. Taylor*, 230 Va. 475, 483-84 (1986))); *Elder v. Holland*, 208 Va. 15, 19 (1967) ("Having concluded that a State employee may be held liable for negligent conduct, we must conclude that a State employee may be held liable for intentional torts."). "The justification for this basic rule is that a person is responsible for the legal consequences of torts committed by that person." Restatement (Third) of Agency, *supra*, § 7.01 cmt. b. "The injury suffered by the victim of a tort

is the same regardless of whether the tortfeasor acted independently or happened to be acting as an agent or employee of another person." *Id.*

In short, we find no error in the trial court's decision denying Devine's motions to strike and refusing to set aside the jury's verdict on Kiley's fraud-in-the-inducement claim.

### B. *Devine's proffered jury instruction (Assignments of Error 2-3)*

Devine also assigns error to the trial court's decision declining to give his proposed Jury Instruction A. "A trial court's decision whether to grant or refuse a proposed jury instruction is generally subject to appellate review for abuse of discretion." *Commonwealth v. Richard*, 300 Va. 382, 389 (2021) (quoting *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017)). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Id.* (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). The purpose of a jury instruction is to "fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them." *Gaalaas ex rel. Gaalaas v. Morrison*, 233 Va. 148, 156 (1987) (quoting *Southers v. Price*, 211 Va. 469, 473 (1971)).

Devine's proposed jury instruction, based on the text of Code § 13.1-1019, would have instructed the jury that he could not be held personally liable for the liabilities of a limited liability company "solely" because of his being a member or agent of the company:

> No member, manager, organizer or other agent of a limited liability company, regardless of whether the limited liability company has a single member or multiple members, shall have any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company.

We find no abuse of discretion in the trial court's decision not to grant that instruction. The parties' dialogue during the charging conference made clear that Kiley was not claiming that Devine was vicariously liable because of his membership in or work for US Financial. Rather,

- 11 -

Kiley claimed that Devine was directly liable for his own intentionally tortious conduct. The court properly instructed the jury that it could find for Kiley only if he "proved by clear and convincing evidence," among other things, that "*Devine* misrepresented a material fact . . . intentionally and knowingly." (Emphasis added.) Devine does not question the correctness of that instruction. Because there was no suggestion that Devine's liability could be merely derivative of US Financial's, "[t]here was not more than a scintilla of evidence," *Richard*, 300 Va. at 391, to support the no-vicarious-liability instruction. Indeed, it would have risked confusing the jury about the law that applied to the case. *Gaalaas*, 233 Va. at 156. Accordingly, the trial court did not abuse its discretion in declining to give Devine's instruction.

CONCLUSION

The evidence sufficed for the jury to find by clear and convincing evidence that Devine defrauded Kiley out of $499,000. The jury was properly instructed that it had to base that finding on Devine's own misrepresentations. Thus, the trial court did not err when it denied Devine's motions to strike and his motion to set aside the verdict.

*Affirmed.*