COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:   Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia


ANN REYNOLDS LEE

v.        Record No. 0306-24-2

OPINION BY
JUDGE FRANK K. FRIEDMAN
AUGUST 12, 2025

WILLIAM MANSON, M.D., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
David M. Barredo, Judge

Christopher L. Spinelli (Howard W.R. Bullock; Emroch & Kilduff,
LLP, on briefs), for appellant.

Marc A. Peritz (Andrew G.H. Miller; Flora Pettit PC, on brief), for
appellees.

Amicus Curiae: Virginia Trial Lawyers Association (Steven G.
Friedman; Michael E. Hollingsworth, Jr.; Marks & Harrison, P.C.;
Hollingsworth, PLLC, on brief), for appellant.


This medical malpractice appeal raises a challenge to the granting of a jury instruction on

habit evidence that is closely modeled after language contained in Code § 8.01-397.1—a statute

which addresses the admissibility of habit evidence.  A jury verdict was returned in favor of

defendants, Dr. William Manson and University of Virginia Physicians Group.  The patient, Ann

Lee, contends that the trial court's granting of the instruction on habit evidence was reversible

error because the instruction was unnecessary, a misstatement of the law, overly argumentative,

an improper comment on (and emphasis of) the habit evidence, and too confusing.  The defense

counters that the case revolved around habit evidence—and that the jurors were, therefore,

entitled to an instruction to aid in their understanding of the evidence.  Further, because the

instruction is modeled so closely after the statute, the defense reasons it is a proper statement of the law.

BACKGROUND

This appeal arises from a medical malpractice suit filed by Lee against Dr. Manson, UVA Physicians Group, and Dr. Troy Davis. In September of 2020, Lee underwent back surgery, specifically an anterior cervical discectomy and fusion, at UVA Medical Center. Dr. Manson was Lee's attending anesthesiologist, and Dr. Davis was a resident physician working under Dr. Manson's supervision during the procedure.[1]

Lee's procedure involved electrical nerve stimulation, which can cause a patient to involuntarily bite down while under anesthesia. To address this issue, "bite blocks" are typically placed in the patient's mouth. This precaution was taken here. At oral argument, Lee's counsel did not dispute that bite blocks were in fact placed in Lee's mouth prior to surgery. The dispute at trial was whether Dr. Manson was negligent in monitoring, placing or maintaining the bite blocks during Lee's surgery. Lee alleged that, due to Dr. Manson's negligence, she "suffered severe and permanent injuries including the severe laceration of her tongue."

The Motion *in Limine* on Habit Evidence

Dr. Manson is a highly experienced anesthesiologist with a busy schedule. He lacked, in many respects, a specific recollection of Lee's surgery and the placement and maintenance of the bite blocks. Prior to trial, Lee filed a motion *in limine* seeking to prevent Dr. Manson and Dr. Davis from testifying about their habit or routine as it related to placement and monitoring of bite blocks. The trial court granted the motion *in limine* in part and denied it in part. The trial

---

[1] Dr. Davis was a surgical resident at UVA. Before trial, Dr. Davis filed a plea in bar raising a sovereign immunity defense. The trial court granted the plea in bar, finding that sovereign immunity applied to Dr. Davis. On appeal, Lee does not challenge this ruling. We will refer to Dr. Manson and UVA Physicians Group collectively as "Dr. Manson."

court agreed with Lee as it related to Dr. Davis, a young resident, finding that any habit or routine evidence was inadmissible as to him because he lacked experience to establish a fixed habit in this type of procedure. But the court found that habit or routine evidence was admissible as it related to Dr. Manson.[2] On appeal, Lee does not assign error to the trial court's admission of habit evidence related to Dr. Manson who had performed this type of procedure hundreds of times. She assigns error to the granting of the instruction that told jurors how to interpret the habit evidence.

### Dr. Manson's Trial Testimony[3]

Dr. Manson testified at trial. He stated that typically the resident, here, Dr. Davis, "places the bite blocks and that's our convention at UVA." Dr. Manson acknowledged that he did not "specifically recall the bite block placement in [Lee's] case." Dr. Manson explained that, as a general practice, he did not document placement of the bite blocks because "the bite block is a routine thing that we do on every one of these cases."

---

[2] The trial court explained its decision to permit Dr. Manson to testify about his habit and routine:

> With regards to Dr. Manson, he's a very experienced doctor, multiple years practicing. I would imagine that this would have been along the lines of routine for him, placing bite blocks, having been elevated to professor and training other doctors in these types of procedures. The Code of Virginia regarding habit evidence states that it's a regular response to repeated specific situations. So with respect to Dr. Manson, it's a factual issue, but with the years of experience he's had, number of procedures similar to this that he's encountered, I think that he certainly is one that has established habits and routines.

[3] Dr. Davis did not testify at trial, but portions of his deposition were admitted at trial, including his testimony that he could not recall who placed the bite blocks during Lee's procedure; however, based on applicable procedures, he believed that he "would have been the person to place the bite blocks." Dr. Davis could not recall whether Dr. Manson directly supervised the placement of the bite blocks.

Dr. Manson testified that it was his habit and routine to direct and supervise the resident physician's placement of bite blocks in the patient's mouth. Dr. Manson confirmed that he had done 400 to 500 cases involving bite blocks in his career. He explained that the bite blocks were "[a]lways" placed immediately after intubation. He further testified that "when you do a procedure four or 500 times you learn and develop that habit and practice of doing it the exact same way every single time and so you know that the moment the intubation is done you've got to, you know, supervise the resident performing the bite blocks the same way every single time."

Dr. Manson also explained his habit and routine after the bite blocks were placed in the patient's mouth: "So after the bite blocks go in, my personal preference is I will insert my gloved finger into the mouth and what I'm attempting to do is feel along the lingual surface of the teeth[,]" and "[t]hen once that's done I insert my finger on this side and do the exact same thing and this takes seconds to perform." Dr. Manson stated that his routine never changed when placing bite blocks.

On cross-examination, Dr. Manson reconfirmed that he did "not have a distinct recollection of" Dr. Davis placing the bite blocks in Lee's case, nor did he recall checking and monitoring the bite blocks. When asked whether he monitored Lee's procedure, he testified that "[w]e were continuously monitoring the case." Dr. Manson reiterated that placement of bite blocks is not typically documented. His experts agreed that declining to document bite block placement was a common practice.

Dr. Manson testified that he discovered Lee's tongue injury at the conclusion of her surgery. Dr. Manson stated that is it uncommon at UVA to check bite blocks mid-surgery: "That is not a common practice at UVA to routinely go under the drapes and check bite blocks throughout the case . . . where there is an MEP [motor-evoked potentials]" procedure being

conducted.  Again, Dr. Manson's expert witnesses confirmed that checking bite blocks under the drapes during spinal surgery can be problematic and introduce risks to the patient.

## The Habit Instruction

Dr. Manson asked the trial court to provide an instruction on habit evidence.  He argued that an instruction on habit evidence was appropriate because habit evidence was before the jury, and it played a significant role in the case.  The proffered instruction was nearly identical to the text of Code § 8.01-397.1, which governs the admissibility of habit evidence.  The proposed instruction stated:

> A "habit" is a person's regular response to repeated specific situations.
> A "routine practice" is a regular course of conduct of a group of persons or an organization in response to repeated specific situations.
> Evidence of the "habit" of a person or the "routine practice" of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the "habit" or "routine practice."

Lee objected to the habit instruction, noting that the instruction was not a model jury instruction and arguing that "[t]his [instruction] invites the jury to confuse the standard of care with habit[,]" and "[i]t will allow the defense to argue that by Dr. Manson following his habit, he's complying with the standard of care."  Relatedly, Lee argued that the instruction "invites confusion as to what the—to substitute standard of care with habit."  Lee also objected on the ground that "habit [evidence] itself has a complicated set of proofs, foundational proofs, and issues that are addressed in the statute itself," and so the instruction "runs the risk of . . . substituting the entirety of the evidence with just testimony about some[one]'s habit."

Dr. Manson disagreed and argued that the instruction was not "any substitute for standard of care" and that the instruction "isn't going into standard of care."  Dr. Manson further argued that the instruction is not "any different than" telling jurors to "disregard sympathy or bias."

Finally, Dr. Manson argued that the instruction was supported by the evidence: "[I]t's well-established that Dr. Manson has established his own habit and practice, which is, you know, a paramount issue in this case. So I think they do need an instruction on this issue." While objecting vociferously to the instruction, Lee did not offer any alternative rewording of the tendered instruction. The trial court granted the habit instruction as submitted by the defense.

As relevant to this appeal, the trial court also instructed the jury that they "are the judges of the facts, the credibility of the witnesses, and the weight of the evidence." Further, the trial court informed the jurors that they "may not arbitrarily disregard believable testimony of a witness[;] [h]owever, after [the jury] ha[s] considered all the evidence in the case, then you may accept or discard all or part of the testimony of a witness as you think proper."

#### The Conflicting Theories on Whether Negligence Occurred

Lee's experts testified that Dr. Manson breached the standard of care in failing to protect Lee's tongue during a surgery where the patient was receiving shocks that could cause her to bite down on her tongue. They suggested that the initial setting of the bite blocks was faulty and that Dr. Manson failed to detect the problem and ensure that the tongue was protected; they also contended that he failed to monitor the bite blocks during the two-hour surgery. They asserted that the nature of the injury showed a long, gradual process of grinding by the patient's teeth which caused damage to her tongue. Lee's experts further contended that simple checks on the bite blocks during the surgery would have prevented or greatly lessened the damage. The experts opined that Dr. Manson breached the standard of care.

The defense experts countered that bite blocks can move during the course of a surgery without negligence by the anesthesiologist and that it is difficult (and sometimes dangerous) to

check bite blocks during a spinal surgery where the patient is draped.[4]  The experts further opined that, in the absence of physical movements suggesting a bite-down, often only visual inspection is appropriate, and it is sometimes "impossible to inspect" the patient's bite blocks during the surgery due to the possibility of infection and other dangers.  They further disputed Lee's claims that the nature of the wound established a long period of grinding, explaining that the "incision of the tongue . . . looks like a very sort of almost neat incision of the tongue length-wise front to back so I don't think the tongue was mashed repeatedly over time, otherwise the wound would be more [grisly]."  The defense experts concluded that Dr. Manson fully met the standard of care in all respects.

The Defense Verdict and Post-Trial Motions

The jury ultimately returned a verdict for the defendants.  Lee filed a motion to set aside the verdict, arguing that the habit instruction constituted reversible error.  In her post-trial motion, Lee claimed that, because the habit evidence statute governs the admissibility of evidence, it was error to use it as an instruction.  Lee asserted that the instruction's "language 'is relevant to prove' confuses the jury" because "a jury could easily misconstrue those words to be 'habit = proof.'"  Lee further argued that the language in the instruction about the routine practice of an organization was not supported by any evidence in the case.  Last, Lee asserted that the habit instruction "place[d] undue weight on the defendants' habit testimony."  Lee did not argue that the instruction was a misstatement of the law in her post-trial motion.

Dr. Manson opposed the motion, arguing that the habit instruction was an accurate statement of the law and supported by the evidence.

---

[4] Surgical draping is a procedure used in preparing certain patients for surgery, and the main purpose is "to keep the field sterile" and "to ensure that there is no infection that gets into the site where the surgeon is operating."  Lee's procedure, which was on her back, required draping.

The trial court ultimately denied the motion and entered final judgment for defendants. Lee appeals.

ANALYSIS

A. Standard of Review

"An appellate court 'review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 228 (2021) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)); *see also Molina v. Commonwealth*, 272 Va. 666, 671 (2006) (same). "An instruction must be supported by 'more than a scintilla' of evidence, viewed in the light most favorable to the proponent[.]" *Nottingham*, 73 Va. App. at 228 (internal citations omitted). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Id.* (alteration in original) (quoting *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017)). "However, this Court reviews *de novo* whether an instruction 'accurately states the relevant law.'" *Id.* (quoting *Ducharme v. Commonwealth*, 70 Va. App. 668, 674 (2019)). When a decision is discretionary, the trial court "has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011).

"Instructions are meant to aid the jury in its deliberations, not to make such deliberations more difficult." *Gaalaas v. Morrison*, 233 Va. 148, 156 (1987). "[N]o instruction should be given that . . . would be confusing or misleading to the jury." *Chavez v. Commonwealth*, 69 Va. App. 149, 156 (2018) (first alteration in original) (quoting *Bryant v. Commonwealth*, 67 Va. App. 569, 582 (2017)); *see also H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 937 (1962) ("An instruction which is confusing, argumentative, long, and merely an attempt on [the party's] part to have the court apparently agree with his theory of the case should be refused."); *King v.*

*Commonwealth*, 2 Va. App. 708, 711 (1986) ("Instructions must be tailored to the evidence and should exclude language that might confuse or distract the jury.").

### B.  The Background Behind Code § 8.01-397.1 and the Role of Habit Evidence

The question of how habit and custom evidence should be utilized in medical malpractice actions has proven to be complex and somewhat controversial.  In *Ligon v. Southside Cardiology Associates*, 258 Va. 306 (1999), our Supreme Court wrestled with the "habit" question in the context of a patient who claimed that she had complained of chest pain after a stress test at a doctor's office and was negligently released without further observation.  The medical providers did not have any recollection of the patient's chest pain complaint and tendered habit testimony that *every* time a patient conveyed the existence of a chest pain to the medical staff after a stress test, the patient was re-evaluated and given an EKG procedure.  *Id.* at 309-10.  The circuit court permitted the "habit" evidence—and this enabled the defense to use it to suggest that the patient did not report any chest pain to them.  *Id.*  A defense verdict ensued.

On appeal, our Supreme Court reversed.  *Id.* at 313.  The medical providers argued unsuccessfully "that in a medical negligence action, when a defendant physician has no memory of a patient, evidence of the physician's routine or habit is relevant to establish his conduct with regard to that particular patient."  *Id.* at 311.  The Supreme Court rejected this logic, observing that:

> In a negligence action, evidence of habitual conduct is inadmissible to prove conduct at the time of the incident complained of because such evidence is collateral to the issues at trial.  Thus, the evidence in question before us was inadmissible because it was collateral to the issues whether this decedent complained of chest pains after her stress test . . . .

*Id.* at 312.

The Supreme Court's ruling that habit evidence was "collateral" to the underlying incident meant that it was not relevant—and therefore not admissible.  *Id.*; *see also Stottlemyer v.*

*Ghramm*, 268 Va. 7, 12 (2004) ("It is an elementary rule that the evidence must be confined to the point in issue, and hence evidence of collateral facts, from which no fair inferences can be drawn tending to throw light upon the fact under investigation, is excluded[.]" (quoting *Jackson v. Chesapeake & Ohio Ry. Co.*, 179 Va. 642, 648 (1942))); *Seilheimer v. Melville*, 224 Va. 323, 327 (1982) (same). However, during its next legislative session, Virginia's General Assembly enacted Code § 8.01-397.1 which flatly rejected the *Ligon* reasoning, stating:

> A. Admissibility. Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye witnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. Evidence of prior conduct may be relevant to rebut evidence of habit or routine practice.

> B. Habit and routine practice defined. A "habit" is a person's regular response to repeated specific situations. A "routine practice" is a regular course of conduct of a group of persons or an organization in response to repeated specific situations.

> C. The provisions of this section are applicable only in civil proceedings.

This enactment plainly instructs our judiciary that such evidence is *relevant* for purposes of *admissibility*. In other words, "habit" testimony is no longer considered "collateral" as the Supreme Court concluded in *Ligon*. Thus, the legislature essentially sided with the defense in *Ligon* that habit evidence, once established, may be admissible in civil cases as evidence that a person acted in conformity with their "routine practice."

The problem in this case is that there is a significant difference between the admissibility of such evidence (which was the object of the statute) and its believability. While admissibility falls within the aegis of the trial judge, credibility is the domain of the factfinder—and the admissibility of such evidence, obviously, does not automatically make it believable. This

tension between admissibility and credibility is at the forefront of Lee's challenge here because

direct language from an *admissibility* statute was used to tell jurors how to *weigh* the evidence.

      C. Whether the Habit Instruction in this Case was so Confusing and Misleading as to
          Require a New Trial

Because Dr. Manson treats many patients and, understandably, does not remember the

minute details of each individual "bite block" placement, the defense sought to employ habit

evidence to suggest that he acted in conformance with his habit when treating Lee. His habit,

according to defense experts, meets the standard of care. The complication, of course, is that

most patients do not end up with serious tongue lacerations as Lee did.

While the legislature, via Code § 8.01-397.1, has made clear that Dr. Manson's habit

evidence is generally admissible—"whether corroborated or not and regardless of the presence of

eye witnesses"—Lee asserts there is a danger, here, that habit evidence was permitted to

overwhelm other tangible evidence for credibility purposes under the instruction granted in this

case.[5] At a minimum, she posits that the instruction is very confusing. We agree.[6]

---

[5] For example, Lee argued the instruction "runs the risk of . . . substituting the entirety of the evidence with just testimony about [someone's] habit" and that the instruction "will allow the defense to argue that by Dr. Manson following his habit, he's complying with the standard of care."

[6] While Dr. Manson has not argued that Lee failed to preserve any of her assignments of error, several of the arguments raised by Lee on appeal were not presented to the trial court at the time the instructions were tendered. A trial court must be given a fair opportunity to rule on an argument for it to be preserved on appeal. *See Moison v. Commonwealth*, 302 Va. 417, 419 (2023) ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." (alteration in original) (quoting Rule 5A:18)); *see also Morgen Indus. v. Vaughan*, 252 Va. 60, 67-68 (1996) ("Generally, the reasons for objecting to the grant or refusal of a jury instruction must be presented to the trial court before such objection will be considered on appeal."). Thus, we do not reach claims involving instructions that are raised for the first time either in a post-trial motion or on appeal. The objection that the instruction was confusing and misleading was plainly raised and preserved below, and it is this objection upon which we will focus.

The habit instruction told jurors that even if Dr. Manson's habits were uncorroborated or unsupported by eyewitnesses, they were "relevant to prove that [his] conduct . . . was in conformity with [his] habit . . . ." Yet Lee observes that her theory of the case was that Dr. Manson did not appropriately place, check or monitor the bite blocks or act consistently with his routine practice; in support of these claims, Lee pointed to—among other things—the doctor's lack of memory, and the lack of documentation of any such placement or monitoring. She further argued that the grinding nature of Lee's injury (per her experts' testimony) meant that the problem had persisted, undetected, for a lengthy period. Moreover, she asserted that, where the defense claims the bite blocks could move without negligence by the doctors, it made no sense not to periodically check the status of the bite blocks over the course of a two-hour surgery involving electrical nerve stimulation. In short, Lee counted on the jury to reject Dr. Manson's habit evidence for *credibility* and accuracy purposes—even though it was admissible.

The standard of care was fixed by expert testimony. *See Raines v. Lutz*, 231 Va. 110, 113 (1986). Lee's expert witnesses indicated that Dr. Manson deviated from the standard of care in placing and monitoring the bite blocks. By contrast, Dr. Manson's experts presented extensive explanations for why he did not deviate from the standard of care based on his habit and routine. In this setting, an instruction on how to view the habit evidence became the focal point of the case.

Lee contends that the habit instruction granted below confused the jury—and unfairly hampered her efforts to persuade the jury to disbelieve Dr. Manson's habit testimony. For example, she urged the jurors to find that the doctor failed to do an initial sweep to check the bite blocks. Yet the instruction told the jurors that habit evidence (that Dr. Manson always did an initial sweep) was "relevant to prove" that he had done so in this instance. The statute tells the

- 12 -

trial court that the habit testimony is "relevant to prove" adherence to routine and is, therefore, *admissible* at trial; but telling the jury the habit testimony is "relevant to prove" conformity with routine practices for factfinding purposes is problematic because the evidence is not relevant to prove *anything* from a credibility standpoint *if it is not believed*. This becomes an even bigger problem where Lee's credibility argument hinges, in part, on a lack of documentation of setting or monitoring the bite blocks, but the instruction tells the jury the habit evidence is "relevant to prove" (in a credibility context) adherence to routine practice whether corroborated or not. The habit evidence statute simply was not written as a legal principle to be applied by a lay jury in weighing evidence. By injecting admissibility concepts from the statute into a factfinding instruction, significant confusion was invited as to the weight of the habit testimony and the role of corroboration to support that evidence.

Dr. Manson correctly contends that the jury instructions must be viewed together—and he suggests that when this occurs the habit instruction is not confusing, but part of a coherent whole. *See SuperValu, Inc. v. Johnson*, 276 Va. 356, 366 (2008) ("When reviewing jury instructions on appeal, we read the instructions together and consider them as a whole."). To be sure, another instruction did tell the jurors that they "are the judges of the facts, the credibility of the witnesses, and the weight of the evidence." The jurors were also instructed that they could reject all or portions of a witness' testimony. But this guidance is directly undercut by the habit instruction which tells the factfinder that habit testimony is "relevant to prove" conformity with routine practice whether corroborated or not.[7]

---

[7] Dr. Manson also argues that "relevant to prove" does not mean the same thing as "proves." Again, relevance relates to admissibility—a term whose legal significance may not be obvious to laypersons. In a perfect trial, a jury will *only* hear relevant evidence—but this does not lessen the confusion emanating from the instruction granted here.

Because there is currently no model jury instruction on habit evidence in Virginia, we are sympathetic to Dr. Manson's efforts to craft one from the related admissibility statute. *See* Code § 19.2-263.2 ("A proposed jury instruction submitted by a party, which constitutes an accurate statement of the law applicable to the case, shall not be withheld from the jury solely for its nonconformance with model jury instructions."). Habit evidence was central to this case, and we agree with the trial court that Dr. Manson was entitled to a proper instruction on this issue. *See Emergency Physicians of Tidewater, PLC v. Hanger*, 303 Va. 77, 88 (2024) ("A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." (quoting *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004))). However, "the duty to properly instruct the jury is not always 'discharged . . . by reading the applicable statute to the jury.'" *Ascher v. Commonwealth*, 12 Va. App. 1105, 1121 (1991) (alteration in original) (quoting *Dowdy v. Commonwealth*, 220 Va. 114, 116 (1979)); *see Oliver v. Forsyth*, 190 Va. 710, 715 (1950) (instructions relying on the words of a statute may require qualification).

We note that various other jurisdictions that employ pattern instructions for habit evidence use language that is very careful to make clear that the factfinder remains free to reject habit testimony if it does not find it credible or persuasive.[8] Virginia relies upon similar

---

[8] The federal model jury instruction on habit evidence provides:

> There has been evidence introduced in this case concerning the habits of plaintiff (*or* defendant *or* other persons *and/or* the routine practices of organization). This evidence may be considered by you in determining whether the plaintiff acted in conformity with that habit (*or* routine practice) on the occasion in question. The weight you give to habit evidence, if any, is entirely up to you, since you are the sole judges of the facts.

4 Modern Federal Jury Instructions—Civil P 74.03 (2024).

guardrails in other instruction contexts. *See Nottingham*, 73 Va. App. at 230 (upholding

challenged instruction reflecting "the well-established rule of law that a victim's testimony, *if*

*believed*, is sufficient to convict[,]" but does not compel "a particular finding" (emphasis

added)).[9]  Such qualifying language is entirely absent here—and, in fact, the opposite message is

suggested: the jury is told habit testimony is relevant to prove conformance whether corroborated

or not.

We conclude that the habit instruction relied upon in this case is confusing and

misleading.  *See Redd v. Ingram*, 207 Va. 939, 942 (1967) (the giving of "inconsistent

instructions is error, unless it plainly appears from the record that the jury could not have been

misled by them"); *Gaalaas*, 233 Va. at 156 ("precisely because it was such a well-fought jury

case, 'the instructions should have been most carefully drawn'" (citation omitted)).  Given the

pivotal role of habit evidence in this case, and the confusing nature of the habit instruction

utilized below, we conclude that there is a substantial likelihood that the granting of the disputed

---

New York's pattern jury instruction on habit evidence in civil cases states:

> The (plaintiff, defendant) has introduced evidence to show that it
> was AB's habit [*here describe conduct.*]  Habit means a person's
> regular practice to act or behave in the same way in the same or
> similar circumstances.  Experience teaches, however, that for one
> reason or another, a person may not always follow his or her habit.
> If you find that it was AB's habit to (act or behave in a particular
> way), then you may, but are not required to, conclude that AB
> (acted or behaved) in accordance with that habit at the time in
> question.

New York Civil Pattern Jury Instructions (PJI), 1:71 (General Instruction—Circumstantial
Evidence—Habit).

[9] *Cf.* Virginia Model Jury Instructions—Criminal No. 2.300 (2024) (Flight "creates no
presumption that the person is guilty of having committed a crime" but "it is a circumstance
which you may consider along with the other evidence.").

instruction significantly harmed Lee's case before the jury.[10]  *See State Highway & Transp.*

*Comm'r v. Allmond*, 220 Va. 235, 241-42 (1979) ("We have frequently held that the giving of

instructions which are confusing or which tend to mislead the jury . . . is reversible error.");

*Flood*, 203 Va. at 937 (reversing judgment where the Court cannot say that the flawed

instruction did not influence the jurors' verdict).  Accordingly, we remand for a new trial.

CONCLUSION

For the foregoing reasons we conclude that the habit instruction granted in this case was

confusing and misleading, necessitating a retrial consistent with the principles set out above.

*Reversed and remanded.*

---

[10] We are cognizant of decisions noting that a trial court need not correct or amend a flawed instruction rather than simply refusing to grant it.  *See Bon Secours-DePaul Med. Ctr., Inc. v. Rogakos-Russell*, ___ Va. ___, ___ (Jan. 2, 2025); *Under Wild Skies, Inc. v. Nat'l Rifle Ass'n of Am.*, ___ Va. ___ (May 29, 2025).  Here, however, the flawed instruction was not refused—and granting it was not harmless error given that Dr. Manson's defense relied so heavily upon his habit and routine.  We think the habit instruction was a significant factor in the defense verdict considering that there was very little evidence presented to the jury regarding Dr. Manson's conduct with respect to Lee's procedure aside from the habit evidence.  *See Blue Stone Land Co. v. Neff*, 259 Va. 273, 279 (2000) ("The [harmless error] doctrine is never applied, however, when it appears that the jury has been misinstructed and, had it been properly instructed, that it might have returned a different verdict.").